**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

STEPHANIE RENE POWERS,　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　**Civil Action No. 1:10-cv-1389**
　　　　　　　　　　　　　　　　　　)
FEDERAL BUREAU OF PRISONS, *et al.*,　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court are the following Motions: (1) Defendants' "Motion to Dismiss the Federal Bureau of Prisons and Alderson Federal Prison Camp for Failure to State a Claim and Lack of Subject Matter Jurisdiction" (Document No. 14.), filed on October 27, 2011; (2) The United States' "Motion to Dismiss Defendants Natalie Wright, M.D. and Patricia McMichael and Substitute the United States" (Document No. 16.), filed on October 27, 2011; (3) The United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Document No. 19.), filed on October 28, 2011; and (4) "Defendants Wright and McMichael's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 24.), filed on November 2, 2011. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4ᵗʰ Cir. 1975), that Plaintiff had the right to file a response to the United States and Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting her claims as they are challenged by the United States and Defendants in moving to dismiss. (Document Nos. 18, 23 and 26.) Plaintiff has filed a Response to the United States and Defendants' Motions. (Document No. 27.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant Defendants' "Motion to Dismiss the Federal Bureau of Prisons and Alderson Federal Prison Camp

for Failure to State a Claim and Lack of Subject Matter Jurisdiction" (Document No. 14.), grant the

United States' "Motion to Dismiss Defendants Natalie Wright, M.D. and Patricia McMichael and

Substitute the United States" (Document No. 16.), grant the United States' Motion to Dismiss for

Lack of Subject Matter Jurisdiction (Document No. 19.), and grant "Defendants Wright and

McMichael's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document

No. 24.)

## **PROCEDURAL HISTORY**

Plaintiff filed a Complaint on December 17, 2010, naming the following as defendants: (1)

Federal Bureau of Prisons; (2) Federal Prison Camp, Alderson; (3) Dr. Natalie Wright, Health

Services Clinical Director; and (4) Ms. McMichael, Health Services Administrator.[1] (Document No.

3, p. 2.) Plaintiff complains that Defendants violated her constitutional rights under the First and

Eighth Amendments. (Id., pp. 5 - 8.) Specifically, Plaintiff complains as follows:

> An indifference by Dr. Natalie Wright (HSU Clinical Director) caused a
> delay in treatment for a hysterectomy recommended by a physician contracted by the
> Federal Bureau of Prisons (Dr. Wheeler). Dr. Wright took no action from 8-20-09
> until 9-21-09 causing a physician assistant, Ms. Dana Renick, to write the
> consultation for surgery. The consultation written by Ms. Renick forced the
> utilization committee to refer the issue of approval for surgery to the regional
> director. The approval for the surgery was then granted by the regional clinical
> director.

> After failing to coerce me into dropping the BP-9, I failed to have the surgery
> done. Ms. McMichael and Dr. Wright proceed to retaliate against me. The most
> heinous act of retaliation happened to me on November 9, 2009, at the Health
> Services Department. I was scheduled to go to Health Services for a routine B12
> shot. While waiting to get my shot, Ms. McMichael forced me into allowing Dr.
> Wright to perform the most humiliating, unprofessional, inappropriate examination

---

[1]   Because Plaintiff is acting *pro se*, the documents which she has filed in this case are held
to a less stringent standard than if they were prepared by a lawyer, and therefore they are construed
liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

on me that I have ever had. This examination was not performed in the privacy of an examination room. This examination bordered, if not crossed the lines, of a sexual assault. After filing administrative remedies, I was informed by the Federal Bureau of Prisons that although the circumstances of the examination were questionable, the examination was necessary. No actions were taken against Dr. Wright and Ms. McMichael. Several of my civil rights were blatantly violated.

(Id.) As relief, Plaintiff requests $100,000,000. (Id., p. 5.)

By Order entered on August 3, 2011, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees. (Document No. 6.) In screening Plaintiff's Complaint, the undersigned determined that Plaintiff had potentially stated a claim under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395 -97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The undersigned instructed Plaintiff that "[i]f Plaintiff's intent was to file an action against the United States pursuant to the Federal Tort Claims Act [FTCA], Plaintiff should notify the Court of her intent in writing." (Id.)

On October 27, 2011, the Federal Bureau of Prisons [FBOP] and Alderson Federal Prison Camp [FPC Alderson] filed a Motion to Dismiss for Failure to State a Claim and Lack of Subject Matter Jurisdiction and Memorandum in Support. (Document Nos. 14 and 15.) Defendants request that the FBOP and Alderson FPC be dismissed based on the following: (1) "There is no Bivens action against the United States or its agencies for any alleged constitutional torts;" and (2) "Based on the common law tort allegations of the Complaint, the plaintiff has not exhausted her administrative remedies pursuant to the FTCA." (Id.)

Also on October 27, 2011, the United States filed a "Motion to Dismiss Defendants Natalie Wright, M.D., and Patricia McMichael and Substitute the United States" and Memorandum of Law in Support. (Document Nos. 16 and 17.) The United States requests that the Court (1) "dismiss Natalie Wright, M.D. and Patricia McMichael from all alleged state law tort claims based upon the

3

Certification by the United States Attorney that they were acting within the scope of their office or employment at the time of the incident out of which the claim arose;" and (2) "substitute the United States in their place as the defendant." (Document No. 16, p. 1.) In support of the Motion, the United States attaches a "Certification" by the United States Attorney. (Document No. 16-1.)

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on October 28, 2011, advising her of the right to file a response to the FBOP and FPC Alderson's Motion to Dismiss for Failure to State a Claim and Lack of Subject Matter Jurisdiction (Document No. 14.) and the United States' "Motion to Dismiss Defendants Natalie Wright, M.D., and Patricia McMichael and Substitute the United States" (Document No. 16.). (Document No. 18.)

On October 28, 2011, the United States filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and Memorandum in Support. (Document Nos. 19 and 20.) The United States argues that Plaintiff's Complaint should be dismissed "without prejudice, for lack of subject matter jurisdiction because the plaintiff has not exhausted her administrative remedies pursuant to the Federal Tort Claims Act." (Id.)

On October 31, 2011, Defendants Wright and McMichael filed their Answers to Plaintiff's Complaint. (Document Nos. 21 and 22.) Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on November 1, 2011, advising her of the right to file a response to the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Document No. 19.). (Document No. 23.)

On November 2, 2011, Defendants Wright and McMichael filed a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 24 and 25.) Defendants contend that Plaintiff's Complaint should be dismissed based upon the

following: (1) "Plaintiff cannot establish a claim of deliberate indifference to her medical conditions" (Document No. 25, pp. 3 - 11.); (2) "Plaintiff cannot establish a claim of retaliation" (Id., p. 12.); (3) "Plaintiff's claim regarding the examination sounds in tort and must be dismissed" (Id., pp. 12 - 13.); (4) "The Defendants are entitled to qualified immunity" (Id., pp. 13 - 16.); and (5) "Plaintiff's claim against the Defendants in their official capacities are barred by sovereign immunity" (Id., pp. 16 - 17.). As Exhibits, Defendants attach the following: (1) The Declaration of Sharon Wahl (Document No. 24-1, pp. 1 - 2.); (2) A "Position Description" of the Health Services Administrator (Id., pp. 3 - 10;) (3) A copy of the Administrative Remedy Packet for Remedy No. 564686 (Id., pp. 11 - 16.); (4) A copy of the Administrative Remedy Packet for Remedy No. 567049 (Id., pp. 17 - 24.); (5) A copy of the Administrative Remedy Packet for Remedy No. 567053 (Id., pp. 25 - 35.); (6) The Declaration of Natalie Wright, D.O. (Document No. 24-2); (7) A copy of Plaintiff's medical records (Document Nos. 24-3, 24-4, 24-5, 24-6, 24-7, and 24-8.); and (8) A copy of Bradley v. United States, 2011 WL 1549208 (N.D.W.Va. April 22, 2011) (Document No. 24-9.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on November 4, 2011, advising her of the right to file a response to Defendants Wright and McMichael's "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 24). (Document No. 26.)

On December 5, 2011, Plaintiff filed her Response in Opposition. (Document No. 27.) First, Plaintiff states that she "did not respond to the subject matter jurisdiction because I do not fully understand whether the United States or defendants themselves should be held accountable for the incident that happened to me while incarcerated at Alderson Federal Prison Camp." (Id., p. 2.) Plaintiff states that she has "since filed a Federal Tort Claim." (Id.) Next, Plaintiff contends that "Dr.

Wright was clearly deliberately indifferent to my serious medical need by delaying the needed consultation for surgery for a hysterectomy." (Id., p. 14.) Plaintiff further states that "Dr. Wright is also guilty of performing an examination on me as an act of retaliation along with Ms. McMichael." (Id.) Plaintiff states that she "concedes that Dr. Rehberg and P.A. Renick followed and addressed all of my healthcare needs and concerns." (Id.) Third, Plaintiff disagrees that she saw Dr. Wright on August 21, 2009. Instead, Plaintiff claims that she saw Dr. Wright on August 20, 2009. (Id.) Fourth, Plaintiff claims that she never told Dr. Wright during her August 2009 appointment that she did not want to have the hysterectomy. (Id., p. 15.) Fifth, Plaintiff argues that her examination conducted on November 9, 2009, "was not a normal examination" because her "right to be examined in privacy was blatantly violated." (Id., p. 16.) Plaintiff explains "Ms. Osborne, Ms. Renick, Ms. Kales, Ms. Corner, Ms. McMichael, Dr. Wright and another inmate were in the same room and were all present during this exam." (Id.) Thus, Plaintiff contends that "Dr. Wright did not act within the scope of her office or employment by performing this exam in such an inappropriate manner." (Id.) Finally, Plaintiff argues that "Ms. McMichael was not acting within the scope of her authority as Health Services Administrator when she called me from my unit to try to coerce me into withdrawing the administrative remedy I had filed for surgery." (Document No. 27-1, p. 15.) Plaintiff explains that "I feel as if the unscheduled, inappropriate examination on November 9, 2009, was her way of retaliating against me for not dropping the authorization for surgery and writing the other administrative remedies on her." (Id.) Plaintiff asserts that "Ms. McMichael violated my constitutional right by denying me privacy during an examination of which I was naked from the waist down and by delaying the scheduling of the surgery by trying to coerce me into dropping the administrative remedy." (Id., p. 15.) Plaintiff claims that Ms. McMichael's conduct "caused me a

6

great deal of emotional distress." (Id.)

As Exhibits, Plaintiff attaches the following: (1) A copy of a Certified Mail receipt, which was addressed to Mid-Atlantic Regional Office dated November 7, 2011 (Document No. 27, pp. 3 - 4.); (2) A copy of a William and Mary Law Review article entitled "*Carlson v. Green*: The Inference of a Constitutional Cause or Action Despite the Availability of a Federal Tort Claims Act Remedy" (Id., pp. 5 - 13.); (3) Copies of pertinent medical records (Document No. 27, pp. 18 - 21, 23 - 26 and Document No. 27-1, pp. 1 - 21); (4) A copy of Associate Warden M. Arisman's Response to Plaintiff's "Inmate Request to Staff Member" dated September 8, 2009 (Document No. 27, p. 22.); (5) A copy of Plaintiff's Request for Administrative Remedy dated November 19, 2009 (Document No. 27-1, pp. 4 - 5.); (6) A copy of the "Callouts for 11-05-2009" (Id., pp. 6 - 7.); (7) A copy of Plaintiff's Request for Administrative Remedy dated September 16, 2009 (Remedy No. 557458-F1) (Id., pp. 8 - 9.); (8)  A copy of Plaintiff's "Inmate Request to Staff" dated October 30, 2009 (Id., p. 10.); (9) A copy of Warden Myron L. Batts' "Response to BP-S148.055 Inmate Request to Staff" dated November 23, 2009 (Id., p. 11.); (10) A copy of the "Callouts for 08-24-2009" (Id., p. 12.); (11) A copy of Plaintiff's Request for Administrative Remedy dated November 4, 2009 (Remedy No. 564686-F1) (Id., pp. 13 - 14.); (12) A copy of Plaintiff's Request for Administrative Remedy dated November 18, 2009 (Id., pp. 16 - 17.); (13) A copy of Plaintiff's "Regional Administrative Remedy Appeal" dated November 30, 2009 (Id., pp. 18 - 19.); (14) A copy of Plaintiff's Request for Administrative Remedy filed on November 4, 2009 (Id., pp. 20 - 21.); and (15) A copy of Plaintiff's Request for Administrative Remedy dated November 18, 2009 (Id., pp. 22 - 23.).

On December 6, 2011, the United States filed a "Supplement to Its Motion to Dismiss." (Document No. 28.) The United States contends that "[t]he court should grant the pending motion

(ECF No. 19) as plaintiff admitted that she filed her FTCA action prematurely." (Id.) Specifically, the United States notes that "plaintiff states that her FTCA administrative claim was allegedly mailed on November 7, 2011." (Id.)

On April 11, 2012, Defendants filed their "Supplemental Memorandum in Support of Their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document No. 30.) Defendants contend that "Plaintiff's claim regarding the November 9, 2009, examination appears to claim not a constitutional violation, but rather an assault and battery or medical professional liability. . . As such, Plaintiff's claim would arise under the FTCA and be brought against the United States." (Id., p. 1.) Defendants acknowledge that the "law enforcement proviso" "preserves the waiver of immunity when certain intentional torts are 'acts or omissions of investigative or law enforcement officers of the United States Government.'" (Id., p. 2.) Defendants note that in Ignacio v. United States, 2012 WL 887594 (4th Cir. Mar. 16, 2012), "the Fourth Circuit recently clarified that when an investigative or law enforcement officer commits one of the intentional torts, such as assault and battery, the immunity is waived, regardless of whether the officer was presently engaged in investigative or law enforcement activity." (Id.) Defendants argue that even though "Defendants are federal law enforcement officers and therefore fall under the law enforcement proviso, . . . Plaintiff's claims still arise under the FTCA, which requires Plaintiff to administratively exhaust her FTCA remedies before filing suit against the United States." (Id.)

## FACTUAL HISTORY

Plaintiff arrived at FPC Alderson on June 12, 2007. (Document No. 24-3, p. 2.) Plaintiff had a history of immune thrombocytopenic purpura (ITP), anemia, and menorrhagia.[2] (Id., p. 4.) On June

---

[2]  Immune thrombocytopenic purpura is a bleeding disorder in which the immune system destroys platelets, which are necessary for normal blood clotting. Menorrhagia is menstrual periods

31, 2007, Physician Assistant [P.A.] Renick conducted a pap smear, prescribed Lupron injections, and ordered follow-up labs within two weeks. (Id., p. 5.) P.A. Renick also sent an ultrasound request to the utilization review committee. (Document No. 24-3, p. 5 and Document No. 24-6, pp. 14 - 15.) By Administrative Note dated August 1, 2007, P.A. Renick clarified that Plaintiff was to receive Lupron injections every 90 days. (Document No. 24-3, p. 6.)  On August 8, 2007, P.A. Renick noted that Plaintiff received her Lupron injection. (Id.) An ultrasound was conducted on August 9, 2007, which showed some fluid in the endometrial cavity and an enlarged uterus with fibroids. (Document No. 24-6, p. 12.) On September 13, 2007, P.A. Renick ordered lab work and requested a consult with a gynecologist for a hysterectomy or thermal ablation. (Document No. 24-3, p. 9.) On September 14, 2007, Dr. Basham-Callaway indicated that Plaintiff had anemia and menorrhagia and her hemoglobin was going down instead of up despite Depo Lupron. (Id., p. 12.) Dr. Basham-Callaway noted that P.A. Renick had made a consult to a gynecologist for a hysterectomy or thermal ablation. (Document No. 24-3, p. 12 and Document No. 24-6, p. 9.) Plaintiff continued to be followed in the Chronic Care Clinic for her anemia. (Document No. 24-3, p. 13, 15, 16.)

On October 16, 2007, Robert L. Wheeler, M.D., an outside OB/GYN, evaluated Plaintiff based upon the consult. (Document No. 24-6, pp. 7 - 8, 13.) Dr. Wheeler noted that Plaintiff had an enlarged uterus and he discussed treatment options including an IUD, endometrial ablation, or hysterectomy. (Id.) Dr. Wheeler stated that Plaintiff choose to have an endometrial ablation. (Id.) Dr. Wheeler noted that the endometrial ablation should ideally be done before the Lupron medication wears off in mid-November. (Id.) On October 24, 2007, P.A. Renick evaluated Plaintiff at the Chronic Care Clinic concerning her anemia. (Document No. 24-3, p. 21.) P.A. Renick noted

in which bleeding is abnormally heavy or prolonged.

that Plaintiff was currently on Lupron for anemia and fibroids and awaiting paperwork for surgery. (Id.) On October 25, 2007, P.A. Renick wrote a consultation for the endometrial ablation. (Document No. 24-6, p. 11.) On December 20, 2007, Dr. Wheeler completed the endometrial ablation at an outside hospital. (Id., p. 5 - 6, 10, 13.)

In January, 2008, Plaintiff began complaining of abdominal pain. (Document No. 24-4, pp. 2, 6, 7.) On February 22, 2008, P.A. Renick requested an abdominal and pelvic ultrasound and hematology consult. (Document No. 24-4, p. 7 and Document No. 24-6, pp. 2 - 4.) On February 29, 2008, Plaintiff was evaluated at the Chronic Care Clinic for her anemia and ITP. (Document No. 24-4, pp. 11 - 12.) A pelvic ultrasound was conducted on April 10, 2008, which revealed a bulky uterus containing fibroids and a solitary Nabothian cyst. (Document No. 24-6, p. 1.) On May 6, 2008, P.A. Renick noted that Plaintiff's anemia had resolved. (Document No. 24-4, p. 17.) On June 24, 2008, P.A. Renick completed a female examination of Plaintiff. (Id., 19.) During Plaintiff's Chronic Care visit on August 6, 2008, P.A. Renick noted that Plaintiff's anemia has been corrected since her ablation conducted in December, 2007. (Document No. 24-5, p. 1.) P.A. Renick also requested a hematology consult based upon Plaintiff's diagnosis of ITP. (Id., p. 2.) By Administrative Note entered on September 9, 2008, Registered Nurse Katrina Lindsey noted that Plaintiff had a "critical lab value: Platelet count is 42." (Id., p. 6.) On September 26, 2008, Plaintiff reported to sick-call complaining of headaches and dizziness. (Id., p. 7.) On September 30, 2008, Plaintiff returned from Raleigh X-ray Diagnostics, where she underwent a brain CT scan due to dizziness, nausea, headaches, and low platelets. (Document No. 24-7, p. 1.) The CT scan was normal. (Id.)

By Administrative Note entered on October 23, 2008, Dr. Rehberg noted that oncology requested a CT scan of the chest, abdominal, and pelvis to help with the treatment associated with

Plaintiff's chronic low platelets. (Document No. 24-5, p. 11.) On November 12, 2008, Register Nurse Michelle Malesky noted that "inmate returned from Raleigh Cancer Treatment Center for bone marrow biopsy of the right hip. (Id., pp. 15 - 16.) On November 13, 2008, Registered Nurse Katrina Cales noted that Plaintiff had her CT scan. (Id., p. 17.) The CT scan revealed an abnormal appearing uterus, and a right ovarian cyst was suggested. (Document No. 24-7, p. 2.) By Administrative Note entered on December 12, 2008, Dr. Rehberg noted that Plaintiff's work up for low platelets was completed, and the diagnosis was normocellular marrow with trilineage hematopoiesis and megakaryocyte hyperplasia. (Document No. 24-5, p. 19 and Document No. 24-7, pp. 3 - 7.) Dr. Rehberg further noted that a request was sent to the Regional Director for a non-formulary request for medication. (Document No. 24-5, p. 19.) During a Chronic Care Visit on March 16, 2009, Defendant Wright evaluated Plaintiff noting that Plaintiff's platelets were drawn every month last year and that her HGB was in the 13 range following her ablation in December, 2007. (Id., p. 25.) Dr. Wright submitted a consult to hematology. (Id., p. 26.) On May 4, 2009, Plaintiff was evaluated by Mark S. Currie, M.D., an outside physician, concerning her chronic thrombocytopenia. (Document No. 24-7, pp. 13 - 14.) Lab work was also completed. (Id., pp. 8 - 12.)

On June 16, 2009, Dr. Rehberg noted that Plaintiff reported some rectal bleeding, dizziness, and continued right lower quadrant pain. (Document No. 24-5, p. 27.) Dr. Rehberg ordered a CT scan of the abdomen and pelvis with and without contrast. (Id., p. 28.) Plaintiff's CT scan was conducted on July 7, 2009. (Document No. 24-5, p. 31 and Document No. 24-7, p. 15.) On July 14, 2009, Dr. Rehberg noted that Plaintiff's CT scan revealed a pelvic mass likely of gynecological origin with neoplasia (abnormal and uncontrolled growth of cells). (Document No. 24-5, p. 33.) Dr.

Rehberg wrote a consult for an OB/GYN visit due to a pelvic mass revealed during the CT scan. (Id..) During a Chronic Care Visit on August 7, 2009, Dr. Rehberg noted that Plaintiff was scheduled for a colonoscopy and OB/GYN visit for a pelvic mass. (Id., pp. 34 - 36.) Dr. Rehberg noted that Plaintiff's platelets were 61 and her other labs were relatively normal. (Id.) On August 12, 2009, Plaintiff saw Dr. Wheeler at the Greenbrier Physicians, Inc., for evaluation of the pelvic mass. (Document No. 24-7, pp. 17 - 19.) Dr. Wheeler noted that Plaintiff had an enlarged uterus, and that she had an MRI reading as a pelvic mass, possible sarcoma. (Id.) Dr. Wheeler noted that the mass may represent a degenerating fibroid, but with Plaintiff's reported pain and the MRI reading, it was difficult to be conservative. (Id.) Dr. Wheeler recommended proceeding directly to a total abdominal hysterectomy. (Id.) Dr. Wheeler noted that conservative treatment could be accomplished with ultrasound, but he suspected the mass would always read as possible cancer. (Id.)

On August 13, 2009, a colonoscopy was performed on Plaintiff. (Document No. 24-5, pp. 39 - 40 and Document No. 24-7, p. 16.) The colonoscopy was normal. (Id.) On August 20, 2009, Defendant Wright discussed with Plaintiff the pros and cons of having a hysterectomy. (Document No. 24-5, pp. 41 - 42.) Specifically, Dr. Wright noted that the "pros" included the following: (1) "She has pelvic mass and a malignancy cannot be 100% excluded;" (2) "She has some irregular bleeding;" (3) "She has some pain;" and (4) "She is 41 years old and has no plans to bear children." (Id., p. 42.) Dr. Wright noted the that the "cons" included the following: (1) "She leaves 10-5-09 (about 6 weeks), which may not be enough time to get surgery scheduled and ensure a full and safe recovery period;" (2) "She has a low platelet count (60k) which should be investigated before surgery and may lead to complications after surgery;" (3) "She is aware of the platelet count and wants to bank autologous blood before surgery; she was not aware that the BOP does not provide

for that;" and (4) "The mass may be benign and she has the option to follow it conservatively." (<u>Id.</u>) Dr. Wright noted that Plaintiff decided to treat conservatively by repeating an ultrasound before her release, taking her records with her, and consulting a physician on the outside upon her release. (<u>Id.</u>) Finally, Dr. Wright noted that Plaintiff "is well aware that I am available to her at any time she has questions and if she changes her mind on any of this we'll try to work something out for her." (<u>Id.</u>)

On August 25, 2009, P.A. Renick noted that Plaintiff "decided to have the surgery." (<u>Id.</u>, pp. 43 - 45.) P.A. Renick prescribed Prednisone for Plaintiff's ITP, noting that she was previously started on Prednisone and "her platelets went up to 95k then dropped back into the 60's." (<u>Id.</u>, pp. 43 - 44.) On September 15, 2009, Plaintiff reported to sick call complaining of nausea since starting the prednisone. (<u>Id.</u>, p. 46.) Plaintiff was evaluated by P.A. Renick, who noted that they were "still awaiting decision from the Regional Director on the surgery" and Plaintiff stated she would give up halfway house placement if necessary because she was concerned about the possible diagnosis. (<u>Id.</u>, pp. 46 - 47.) P.A. Renick instructed Plaintiff to stop the prednisone for right now since the surgery had not been approved by the Regional Director. (<u>Id.</u>, p. 48.) P.A. Renick noted that Plaintiff's symptoms would be monitored and labs would be redrawn and compared. (<u>Id.</u>) On September 24, 2009, the Regional Medical Director approved the request for surgery and Plaintiff was instructed to stop taking certain medications. (<u>Id.</u>, p. 49.) On September 29, 2009, P.A. Renick saw Plaintiff for lab follow-up and noted that Plaintiff had stopped all her medications awaiting surgery. (<u>Id.</u>, pp. 51 - 52.)

On October 1, 2009, Dr. Wheeler performed a total abdominal hysterectomy and right salpingo-oophorectomy at an outside hospital. (Document No. 24-7, pp. 22 - 25.) By Administrative Note entered on October 2, 2009, Defendant Wright noted that she spoke to Dr. Wheeler, who

reported that "the procedure went well. The right tube and ovary looked 'ugly' and were stuck to the anterior surface of the uterus. Probably secondary to endometriosis. The uterus was opened and examined in the OR and the masses appeared to be simply fibroids. Pathology is pending." (Document No. 24-5, p. 54.) By Administrative Note entered on October 3, 2009, Defendant Wright noted that she "called for a report today, but Dr. Wheeler had just left the floor and he didn't leave a note about discharge planning. The nurse says [Plaintiff] is up and walking, tolerating a regular diet. No nausea/vomiting. The duty officer has visited [Plaintiff] and [Plaintiff] says she's coming back to Alderson tomorrow." (Id., p. 55.) Plaintiff returned to FPC Alderson on October 4, 2009, and was evaluated by Registered Nurse Jennifer Piner. (Id., p. 56.) Registered Nurse Piner noted that Plaintiff reported no problems and stated that the pain was getting better. (Id.) Registered Nurse Piner instructed Plaintiff on post-op complications, symptoms to report, and methods of prevention. (Id., pp. 57 - 58.)

On October 13, 2009, P.A. Renick saw Plaintiff for a post-operative visit. (Id., p. 59.) Plaintiff reported that she no longer needed pain medication other than Ibuprofen. (Id.) Plaintiff noted that she had some dysuria, but no frequency or urgency, and no heavy vaginal bleeding. (Id.) P.A. Renick noted that Plaintiff could gradually increase activities as tolerated, but nothing strenuous until her 4 week visit. (Id., p. 60.) On October 27, 2009, P.A. Renick saw Plaintiff for another post-operative visit. (Id., p. 62.) Plaintiff complained of some spotting and some menstrual-like cramping. (Id.) P.A. Renick noted that the "cuff is healing with a portion in the center with some old discharge, but no active bleeding. (Id.) P.A. Renick instructed Plaintiff to notify Health Services if the bleeding increased to a menstrual flow and scheduled Plaintiff for a six-week check with Defendant Wright. (Id., p. 63.) On November 9, 2009, Defendant Wright examined Plaintiff for her

14

hysterectomy post-operative check. (<u>Id.</u>, p. 64.) Defendant Wright noted that Plaintiff had no complaints, no pain, and no drainage. (<u>Id.</u>) Defendant Wright noted that the "cuff is well healed" and "no signs of infection." (<u>Id.</u>) Defendant Wright further noted that Plaintiff was to be released to a halfway house and cleared Plaintiff for transfer. (<u>Id.</u>) On December 2, 2009, Plaintiff reported to sick-call requesting to restart Prozac. (<u>Id.</u>, p. 68.) P.A. Renick noted that Plaintiff complained she was "going through some stressful situations," reported a history of rape in the past, and indicated "she was trying to deal with the 11/9/2009 exam and how things were handled." (<u>Id.</u>) P.A. Renick prescribed Prozac and instructed Plaintiff to follow-up at sick-call as needed. (<u>Id.</u>, p. 69.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 129, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting <u>Bell Atlantic Corporation v. Twombly</u>, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." <u>Twombly</u>, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment.

Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

**Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

**DISCUSSION**

1.   **FTCA Claim:**

A.     **The United States as a Party.**

In its Motion, the United States argues that Defendants Natalie Wright, M.D., and Patricia McMichael should be dismissed and the United States substituted as the Defendant. (Document Nos. 16 and 17.) In support, the United States Attorney filed a "Certification" stating that Defendants

16

"Natalie Wright, M.D. and Mrs. Patricia McMichael, were acting within the scope of their employment as employees of the United States at the time of the incident out of which the claim arose." (Document No. 16-1.) In her Response, Plaintiff contends that "Dr. Wright did not act within the scope of her office or employment by performing [the November 9, 2009] exam in such an inappropriate manner." (Document No. 27, p. 16.) Plaintiff further argues that "Ms. McMichael was not acting within the scope of her authority as Health Services Administrator when she called me from my unit to try to coerce me into withdrawing the administrative remedy I had filed for surgery." (Document No. 27-1, p. 15.)

The Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671, *et seq*., authorizes suits against the United States for damages for injuries or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable in accordance with the law of the place where the act or omission occurred. The FTCA provides at 28 U.S.C. § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

Inmates may file claims of liability against the United States but may not assert claims of personal liability against prison officials for violations of their constitutional rights under the FTCA. Carlson v. Green, 446 U.S. 14, 21 - 23, 100 S.Ct. 1468, 1472 -74, 64 L.Ed.2d 15 (1980). In order to maintain a case against the United States under the FTCA, Plaintiff must demonstrate that her action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the State in which the action accrued.

The United States attaches a "Certification" by the United States Attorney stating that Natalie Wright and Patricia McMichael "were acting within the scope of their employment as employees of the United States at the time of the incident out of which the claim arose." (Document

No. 16-1.) A United States Attorney's certification "is conclusive unless challenged."[3] Gutierrez de Martinez v. Drug Enforcement Admin., 111 F.3d 1148, 1153 (4th Cir. 1997). "When the certification is challenged, it serves as prima facie evidence and shifts the burden to the plaintiff to prove, by a preponderance of the evidence, that the defendant federal employee was acting outside the scope of his employment." Id.; Also see Maron v. United States, 126 F.3d 317, 323 (4th Cir. 1997). In determining whether certification is proper, the Court reviews the question de novo. Gutierrez, 111 F.3d at 1154. The plaintiff must present "specific evidence or the forecast of specific evidence that contradicts the Attorney General's certification decision, not mere conclusory allegations and speculation." Id. at 1155. If the plaintiff presents evidence satisfying her burden of proof, the defendant may come forward with evidence in support of the certification. Id. The Court reviews the "certification, the pleadings, the affidavits, and any supporting documentary evidence" for issues of material fact. Id. "Only if the district court concludes that there is a genuine question of fact material to the scope-of-employment issue should the federal employee be burdened with discovery and evidentiary hearing." Id. In determining whether a federal employee was acting within the scope of his or her employment, the Court applies the law of the State where the conduct occurred. Id. at 1156(citing Jamison v. Wiley, 14 F.3d 222, 227 n. 2 (4th Cir. 1994).

The undersigned notes that it is undisputed that Defendants Wright and McMichael's alleged misconduct occurred at FPC Alderson, which is located in Alderson, West Virginia. Thus, the Court will apply the law of the State of West Virginia in determining whether Defendants Wright and

---

[3] Title 28 U.S.C. § 2679(d)(1) provides as follows:

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim is a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

McMichael were acting within the scope of their employment. The West Virginia Supreme Court has defined "scope of employment" as "a relative term and requires a consideration of surrounding circumstances, including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the purpose of the act." Foodland v. State ex rel. W. Va. Dept. of Health and Human Res., 207 W.Va. 392, 397, 532, S.E.2d 661, 665 (2000). Furthermore, the West Virginia Supreme Court explained that an act is within the scope of employment if:

> (1) It is something fairly and naturally incident to the business and (2) it is done while the servant was engaged upon the master's business and is done, although mistakenly or ill-advisedly, with a view to further the master's interest, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent and personal motive on the part of the servant to do the act upon his own account.

Id.

In the instant case, Plaintiff alleges that Defendant Wright engaged in improper conduct while working as a doctor at FPC Alderson and Defendant McMichael engaged in improper conduct while working as the Health Services Administrator at FPC Alderson. Plaintiff admits that Defendant Wright performed a female examination upon Plaintiff on November 9, 2009, but complains that the exam was performed in an unprofessional and embarrassing manner. Plaintiff further acknowledges that she filed administrative remedy requests concerning the alleged delay in performing her surgery, but complains that Defendant McMichael improperly attempted to resolve the issue. Based upon the foregoing, the undersigned finds that Plaintiff has failed to establish by a preponderance of the evidence that Defendants Wright and McMichael were acting outside the scope of their employment as defined by West Virginia law. Defendant Wright's action of performing a female examination  was "fairly and naturally incident to the business" of providing

medical care within a prison.[4] Further, Defendant McMichael's action of attempting to resolve an

issue raised in an administrative remedy request was "fairly and naturally incident to the business"

of a Health Services Administrator.[5] Although Plaintiff contends that Defendants Wright and

McMichael acted improperly due to an alleged dislike of Plaintiff, a person acts within the scope

of her employment even if her conduct results "from some impulse or emotion which naturally grew

out of, or was incident to the attempt to perform the master's business." Thus, even assuming that

Defendants Wright and McMichael's actions may have escalated to improper conduct, they were

clearly acting within the scope of their employment as medical staff at FPC Alderson. Further, there

is no evidence or allegation that Defendants Wright and McMichael's conduct was the result of

some external, independent, or personal motive. See LeRose v. United States, 285 Fed.Appx. 93 (4th

Cir. 2008)(finding that a correctional officer's action of extorting money from prisoners was beyond

the scope of his employment because the conduct was for the officer's own benefit and not intended

to benefit the Bureau of Prisons or the United States). The undersigned, therefore, recommends that

the "United States' Motion to Dismiss Defendants Natalie Wright, M.D. and Patricia McMichael

and Substitute the United States" (Document No. 16.) be granted as to Plaintiff's FTCA claim.

### B.    Exhaustion of Administrative Remedies.

In its Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction, the United States

--------

[4]  The undersigned notes that there appears to be no material issue of fact concerning the issue of proper certification. Based upon allegations contained in Plaintiff's Complaint, the United States filed its certification stating that Defendants Wright and McMichael were acting within the scope of their employment.

[5]  As a general matter, a federal inmate is required first to attempt to resolve her complaints informally by the submission of an "Inmate Request to Staff Member" form. 28 C.F.R. § 542.13. A duty of the Health Services Administrator includes "investigating and/or hearing grievances or complaints and implementing or recommending appropriate actions." (Document No. 24-1, p. 4.)

argues that "the plaintiff has not exhausted her administrative remedies pursuant to the Federal Tort Claims Act." (Document Nos. 19 and 20.) In Response, Plaintiff states she has filed a FTCA administrative claim since the filing of her Complaint. (Document No. 27, p. 2.) In support, Plaintiff attaches a copy of a Certified Mail receipt, which was addressed to Mid-Atlantic Regional Office dated November 7, 2011 (Document No. 27, pp. 3 - 4.) In Reply, the United States contends that "[t]he court should grant the pending motion (ECF No. 19) as plaintiff admitted that she filed her FTCA action prematurely." (Document No. 28.)

The Federal Tort Claims Act is a limited waiver of sovereign immunity. This waiver is subject to the condition that an administrative claim must first be submitted to the appropriate agency and denied before suit can be filed. See 28 U.S.C. § 2675(a).[6] See also Bellomy v. United States, 888 F. Supp. 760 (S.D.W.Va. 1995). Filing a timely administrative claim is jurisdictional and cannot be waived. Ahmed v. United States, 30 F.3d 514, 516 (4th Cir. 1994) (citing Henderson v. United States, 785 F.2d 121, 123 (4th Cir. 1986); Muth v. United States, 1 F.3d 246 (4th Cir. 1993). Thus, before an inmate can bring a claim under the FTCA, the inmate must exhaust procedures specified at 28 C.F.R. §§ 14.1 to 14.115 and 543.30 to 543.32. The administrative process which inmates must exhaust when they have complaints under the FTCA is spelled out at 28 C.F.R. §§ 14.1 - 14.11. To exhaust administrative remedies as required before filing an action under the FTCA, the

---

[6] Title 28 U.S.C. § 2675(a) provides as follows:

An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

inmate must first submit an administrative claim including a claim for money damages in a sum certain for the alleged injury sustained on a Standard Form 95 to the Federal agency whose activities gave rise to the claim. Id., § 14.2(a) and (b)(1). After investigation and examination and informal attempts at resolving the inmate's claim as the circumstances may require, Id., §§ 14.6 and 14.8, the agency may deny or approve the inmate's claim. If the agency denies the inmate's claim, she may file suit in the District Court within six months of the mailing of the denial. Id., § 14.9(a). The Director of the Federal Bureau of Prisons is authorized to settle meritorious administrative Federal tort claims by providing monetary compensation. 28 C.F.R. §§ 0.96(k) and 0.172.

Based upon a review of the record, the undersigned finds that Plaintiff failed to properly exhaust her administrative remedies pursuant to the FTCA prior to filing her Complaint. Plaintiff appears to argue that her FTCA claim should not be dismissed because she filed her FTCA administrative claim after filing of her Complaint.[7] As stated above, an administrative claim must

_____

[7] The Court notes that Plaintiff attaches copies of her administrative remedies related to the exhaustion of her *Bivens* claim. Exhaustion requirements concerning FTCA and *Bivens* actions differ. *See Davis v. United States*, 2007 WL 3473275 (N.D.W.Va. Nov. 13, 2007); *Murphy v. Inmate Systems Management*, 2008 WL 793631 (S.D.W.Va. Mar. 20, 2008). For *Bivens* purposes, proper exhaustion of available administrative remedies requires that "a prisoner must submit inmate complaints and appeals in the place, and at the time, the prison's administrative rules require." *Dale v. Lappin*, 376 F.3d at 655 (internal citations omitted); *also see Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006)(stating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings"). The Federal Bureau of Prisons [BOP] has established an Administrative Remedy Program, 28 C.F.R. § 542.10, *et seq.*, through which an inmate may seek formal review of issues or complaints relating to confinement. Depending upon at what level an inmate initiates it, the BOP's Administrative Remedy Program is a three-step or four-step grievance procedure. As a general matter, a federal inmate is required first to attempt to resolve his complaints informally by the submission of an "Inmate Request to Staff Member" form. 28 C.F.R. § 542.13. The inmate's request may be rejected if improper, and the inmate will then be advised of the proper administrative procedure. *Id.* Within 20 days after the circumstances occurred which are the subject of the inmate's complaints, the inmate must complete this first step and submit a formal "Administrative Remedy Request" on a BP-9 form to an institution staff member designated to receive such Requests, 28 C.F.R. § 542.14(a) and (c)(4), or under exceptional circumstances to the appropriate Regional Director. *Id.*, § 542.14(d). The Warden of the institution and the Regional Director must respond to the inmate's Request within 20 and 30 days

first be submitted to the appropriate agency and denied before suit can be filed. See 28 U.S.C. § 2675(a). Accordingly, the undersigned recommends that the United States' Motion to Dismiss Complaint for Lack of Subject Matter Jurisdiction (Document No. 19.) be granted.

**2.      Bivens Claim:**

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under Bivens must show the violation of a valid constitutional right by a person acting under

---

respectively. *Id.*, § 542.18. If the inmate's Request was directed to the Warden of the institution and the Warden's response is unfavorable, the inmate may appeal within 20 days to the Regional Director on a BP-10. *Id.*, § 542.15(a) and (b). If the inmate's Request went initially to the Regional Director, the inmate may appeal an unfavorable response to General Counsel on a BP-11 form within 30 days after the Regional Director signed the response. *Id.*, § 542.15(a). General Counsel has 40 days to respond to the inmate's appeal. *Id.*, § 542.18. The administrative process is exhausted when General Counsel issues a ruling on the inmate's final appeal. *Id.*, § 542.15(a). The entire process takes about 120 days to complete. An inmate's submission may be rejected at any level for failure to comply with the administrative remedy requirements or if the submission is written in an obscene or abusive manner. *Id.*, § 542.17(a). The inmate will be provided with notice of any defect and whether the defect is correctable. *Id.*, § 542.17(b). If a request or appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection to the next appeal level. *Id.*, § 542.17(c).

color of federal law.[8] The United States Supreme Court has held that an inmate may name a federal

officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional

violation pursuant to Bivens. See Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271

(1991). However, Bivens claims are not actionable against the United States, federal agencies, or

public officials acting in their official capacities. See FDIC v. Meyer, 510 U.S. 471, 475, 484-86,

114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991);

Reinbold v. Evers, 187 F.3d 348, 355 n. 7 (4th Cir. 1999).

### A.     Federal Bureau of Prisons and FPC Alderson as Defendants.

The FBOP and FPC Alderson filed a Motion to Dismiss for Failure to State a Claim and

Lack of Subject Matter Jurisdiction arguing that "[t]here is no Bivens action against the United

States for its agencies for any alleged constitutional torts." (Document Nos. 14 and 15.) In Response,

Plaintiff states that she "did not respond to the subject matter jurisdiction because I do not fully

understand whether the United States or defendants themselves should be held accountable for the

incident that happened to me while incarcerated at Alderson Federal Prison Camp." (Document No.

27, p. 2.) Federal inmates may file claims of personal liability against individual prison officials for

---

[8] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may assert claims of personal liability against individual prison officials for violations of their constitutional rights but may not assert claims against the government or prison officials in their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72, that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

violations of their constitutional and civil rights pursuant to <u>Bivens</u>, but may not assert claims against the government or prison officials in their official capacities. The FBOP and FPC Alderson are not "persons" as required by <u>Bivens</u>. As stated above, federal agencies are not proper defendants under <u>Bivens</u>. Therefore, the undersigned concludes that the FBOP and FPC Alderson should be dismissed as defendants.

### B.     No evidence of deliberate indifference.

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." <u>Wolfish v. Levi</u>, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, <u>Bell v. Wolfish</u>, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). <u>See also</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), <u>quoting</u> <u>Hudson v. Palmer</u>, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" <u>Id.</u> at 298, 111 S.Ct. 2321 (<u>citing</u> <u>Rhodes v. Chapman</u>, 452 U.S. at 347, 101 S.Ct.

2392).“In order to establish the imposition of cruel and unusual punishment, a prisoner must prove

two elements – that ‘the deprivation of [a] basic human need was objectively sufficiently serious,’

and that ‘subjectively the officials act[ed] with a sufficiently culpable state of mind.’” Shakka v.

Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir.

1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)(“In *Strickler*,

we held that a prisoner must suffer ‘serious or significant physical or mental injury’ in order to be

‘subjected to cruel and unusual punishment within the meaning of the’ Eighth Amendment.”) A

medical need serious enough to give rise to an Eighth Amendment claim involves a condition which

places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or

a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the

applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider’s actions constitute deliberate indifference
> to a serious medical need, the treatment must be so grossly incompetent, inadequate
> or excessive as to shock the conscience or to be intolerable to fundamental fairness.
> * * * Deliberate indifference may be demonstrated by either actual intent or reckless
> disregard. * * * A defendant acts recklessly by disregarding a substantial risk of
> danger that is either known to the defendant or which would be apparent to a
> reasonable person in the defendant’s position. * * * Nevertheless, mere negligence
> or malpractice does not violate the eighth amendment. (Citations omitted)

See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were

aware that inmate’s condition had worsened and was life-threatening and intentionally ignored the

situation and refused to seek medical assistance provided a reasonable basis for finding deliberate

indifference to inmate’s medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert.

denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee’s allegations of delay

in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to

his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for

defendants affirmed where claim that inmate received constitutionally inadequate medical treatment

involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must

26

first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon her Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to her. See Farmer, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. It is well established that a private physician under contract with a State to provide medical services to inmates acts under color of State law when treating them and may therefore be held liable under Section 1983. See West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2257, 101 L.Ed.2d 40 (1988); Conner v. Donnelly, 42 F.3d 220, 225 (4th Cir. 1994) ("If a physician treating a prisoner – whether by contract or referral – misuses his power by demonstrating deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law.") Plaintiff in this case must therefore allege and establish that each Defendant was aware that she was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

Plaintiff alleges that Defendant Wright acted with deliberate indifference in failing to take any action from August 20, 2009 until September 21, 2009, which resulted in a delay of her surgery. Plaintiff further alleges that Defendants Wright and McMichael's conducted an unscheduled and improper female examination on November 9, 2009. According to the medical records, Plaintiff saw Dr. Wheeler for evaluation of a pelvic mass on August 12, 2009. (Document No. 24-7, pp. 17 - 19.) Dr. Wheeler noted that the mass may represent a degenerating fibroid, but with Plaintiff's reported pain and the MRI reading, it was difficult to be conservative. (Id.) Dr. Wheeler recommended proceeding directly to a total abdominal hysterectomy. (Id.) Dr. Wheeler noted that conservative

treatment could be accomplished with an ultrasound. (Id.) On August 20, 2009, Defendant Wright

discussed with Plaintiff the pros and cons of having a hysterectomy. (Document No. 24-5, pp. 41 -

42.) Dr. Wright noted that Plaintiff decided to treat conservatively by repeating an ultrasound before

her release, taking her records with her, and consulting a physician on the outside upon her release.

(Id.) Dr. Wright further noted that she was available if Plaintiff had any questions or changed her

mind about the surgery. (Id.) On August 25, 2009, P.A. Renick noted that Plaintiff "decided to have

the surgery" and she prescribed Prednisone for Plaintiff's ITP. (Id., pp. 43 - 45.) On September 15,

2009, Plaintiff reported to sick call complaining of nausea since starting the prednisone. (Id., p. 46.)

Plaintiff was evaluated by P.A. Renick, who noted that they were "still awaiting decision from the

Regional Director on the surgery" and Plaintiff stated she would give up halfway house placement

if necessary because she was concerned about the possible diagnosis. (Id., pp. 46 - 47.) On

September 24, 2009, the Regional Director approved the request for surgery and Plaintiff was

instructed to stop taking certain medications. (Id., p. 49.) On September 29, 2009, P.A. Renick saw

Plaintiff for lab follow-up and noted that Plaintiff had stopped all her medications awaiting surgery.

(Id., pp. 51 - 52.) On October 1, 2009, Dr. Wheeler performed a total abdominal hysterectomy and

right salpingo-oophorectomy at an outside hospital. (Document No. 24-7, pp. 22 - 25.) By

Administrative Note entered on October 2, 2009, Defendant Wright noted that she spoke to Dr.

Wheeler, who reported that the procedure went well and the masses appeared to be simply fibroids

but pathology is pending. (Document No. 24-5, p. 54.) By Administrative Note entered on October

3, 2009, Defendant Wright noted that she called for a report today, and the nurse reported that

Plaintiff was up and walking, tolerating a regular diet, and no nausea or vomiting. (Id., p. 55.)

Plaintiff returned to FPC Alderson on October 4, 2009, and was evaluated by Registered Nurse

Jennifer Piner. (Id., p. 56.) Registered Nurse Piner noted that Plaintiff reported no problems and

stated that the pain was getting better. (Id.) On October 13, 2009, P.A. Renick saw Plaintiff for a

post-operative visit and Plaintiff reported that she no longer needed pain medication other than

28

Ibuprofen. (Id., p. 59.) On October 27, 2009, P.A. Renick saw Plaintiff for another post-operative visit and Plaintiff complained of some spotting and some menstrual-like cramping. (Id., p. 62.) P.A. Renick noted that the "cuff is healing with a portion in the center with some old discharge, but no active bleeding. (Id.) P.A. Renick instructed Plaintiff to notify Health Services if the bleeding increased to a menstrual flow and scheduled Plaintiff for a six-week check with Defendant Wright. (Id., p. 63.) On November 9, 2009, Defendant Wright examined Plaintiff for her hysterectomy post-operative check and noted that Plaintiff had no complains, no pain, and no drainage. (Id., p. 64.) Defendant Wright noted that the "cuff is well healed" and "no signs of infection." (Id.) Defendant Wright further cleared Plaintiff for transfer to halfway house placement. (Id.)

For purposes of considering Defendants' Motion, the undersigned will assume that Plaintiff's medical condition was serious enough to give rise to an Eighth Amendment claim. Plaintiff, however, cannot satisfy the subjective component. The Court first finds that Defendant Wright did not act with deliberate indifference in scheduling Plaintiff's surgery. The record reveals that Dr. Wheeler saw Plaintiff August 12, 2009, and discussed the treatment options concerning her pelvic mass. Approximately eight days later, Defendant Wright discussed with Plaintiff the "pros" and "cons" of having a total abdominal hysterectomy and the option of treating her condition conservatively by use of an ultrasound. Plaintiff's medical records indicate that she informed Defendant Wright that she wanted to treat her condition conservatively. Five days later on August 25, 2009, Plaintiff informed P.A. Renick that she wanted to have the hysterectomy and the process for scheduling the surgery was initiated. Plaintiff's hysterectomy was conducted approximately five weeks later on October 1, 2009. Thus, there is no evidence that Defendant Wright knew of and disregarded an excessive risk to Plaintiff's health or safety or deliberately delayed the scheduling of Plaintiff's surgery. To the extent Plaintiff contends that Defendant Wright acted with deliberate indifference on August 20, 2009, by erroneously indicating that Plaintiff did not want the surgery, the Court finds her claim to be without merit. The medical records clearly indicate that P.A. Renick

29

corrected any error on August 25, 2009, when she noted that Plaintiff wanted to have the surgery.

Moreover, Plaintiff's surgery was conducted less than two months after Defendant Wright received

Dr. Wheeler's recommendation for surgery and Plaintiff was consistently evaluated by medical staff

during this period of time. The Court further notes that even though Dr. Wheeler recommended a

total abdominal hysterectomy, Dr. Wheeler did not determine that the surgery was absolutely

necessary. Dr. Wheeler advised that Plaintiff's condition could be treated conservatively with

follow-up ultrasounds. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth

Circuit has observed that an inmate's treatment may be limited to what is medically necessary as

opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010

WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48

(4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision

to provide plaintiff with one medication over another does not give rise to a constitutional

violation.") Accordingly, the undersigned finds that Defendant Wright did not act with deliberate

indifference in scheduling Plaintiff's surgery.

Next, the Court finds that Defendants Wright and McMichael did not act with deliberate

indifference in conducting a female examination upon Plaintiff on November 9, 2009.[9] The Court

finds that Plaintiff's claim that the exam was unscheduled to be without merit. According to the

medical records, P.A. Renick noted on October 27, 2009, that Plaintiff would be scheduled for a six

week post-operative check with Defendant Wright. Plaintiff's post-operative exam with Defendant

Wright occurred on November 9, 2009, approximately six weeks after her surgery. Plaintiff

complains that the exam was conducted in an unprofessional and embarrassing manner. Plaintiff

explains that she was instructed to undress from the waist down, was not provided with a sheet for

---

[9] To the extent Plaintiff alleges that the female exam "bordered on sexual assault," Plaintiff claim sounds in tort as an allegation of assault and battery or unprofessional conduct. As stated above, Plaintiff did not properly exhaust her administrative remedies concerning her FTCA claim.

coverage of her lower body, and the exam was conducted in a room where other medical personnel were present. The Court finds that although the circumstances of the exam were less than ideal and Defendants' failure to provide Plaintiff with a sheet was distasteful, such conduct does not result in deliberate indifference.[10] To the extent Plaintiff alleges that the exam was unnecessary because P.A. Renick had already examined her, such a claim is also without merit. The medical records indicate that it was necessary for Plaintiff to be evaluated by a doctor regarding her six-week post-operative visit and for the purposes of clearing Plaintiff for transfer to a halfway house placement. Accordingly, the undersigned finds that Defendants Wright and McMichael did not act with deliberate indifference in performing Plaintiff's female examination on November 9, 2009.

### C.    Retaliation.

Plaintiff alleges that Defendants Wright and McMichael conducted an unscheduled and improper female examination on November 9, 2009, in retaliation for Plaintiff filing administrative remedy requests. The Fourth Circuit has held that an inmate's claims of retaliation must be treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996)(*en banc*)(citations omitted). To prevail upon a claim of retaliation, the inmate must specifically demonstrate that but for his protected conduct, she would not have been subject to the alleged retaliatory act. See Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). Essentially, the inmate must first demonstrate that she engaged in protected conduct and second that her protected conduct motivated the retaliatory act.

---

[10] To the extent Plaintiff is alleging a violation of her right to privacy, the undersigned finds her claim to be without merit. *See Jackson v. Wiley*, 352 F.Supp.2d 666 (E.D.Va. Feb. 10, 2004)(finding that correctional officer did not violate inmate's constitutional right to privacy in his genitalia by performing a routine strip search of inmate during prison intake in the presence of two female nurses). The Court notes that Plaintiff does not allege that she was viewed by male correctional officers or male inmates.

31

To the extent that Plaintiff alleges retaliation in response her filing administrative remedy requests, the undersigned will find that she has satisfied the first part of the analysis. "The First Amendment grants the rights to free speech and to seek redress of grievances. These rights, to a limited extent, exist in a prison setting." Gullett v. Wilt, 869 F.2d 593, 1989 WL 14614 ** 2 (4th Cir. (Md.) Feb. 21, 1989)(unpublished)(citing Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)). Plaintiff has not, however, demonstrated that the performance of the female examination on November 9, 2009, was motivated in any manner by her filing of administrative remedy requests. According to the medical records, Defendant Wright examined Plaintiff on November 9, 2009, for her six-week post-operative visit. The undersigned finds that the record clearly establishes that the Plaintiff's examination was conducted for legitimate, nonretaliatory reasons. Specifically, it was necessary for Plaintiff to be evaluated by a doctor prior to her transfer to halfway house placement. The showing of adversity is an essential element to any retaliation claim. See American Civil Liberties Union v. Wicomico County, 999 F.2d at 785. Therefore, Plaintiff's conclusory allegations of retaliation do not establish a claim of constitutional magnitude.[11]

## PROPOSAL AND RECOMMENDATION

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Defendants' "Motion to Dismiss the Federal Bureau of Prisons and Alderson Federal Prison Camp for Failure to State a Claim and Lack of Subject Matter Jurisdiction" (Document No. 14.), **GRANT** the United States' "Motion to Dismiss Defendants Natalie Wright, M.D. and Patricia McMichael and Substitute the United States" (Document No. 16.), **GRANT** the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Document No. 19.), **GRANT** "Defendants Wright and McMichael's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (Document No. 24.),

---

[11] The undersigned finds it unnecessary to address the remaining issues that Defendants have presented for dismissal of Plaintiff's claim.

**DISMISS** Plaintiff's Complaint (Document No. 3.) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have seventeen days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Faber and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to Plaintiff, who is acting *pro se*, and counsel of record.

Date: May 23, 2012.

R. Clarke VanDervort
United States Magistrate Judge

33